Thank you, you may be seated. Good afternoon. We are here today in case number 2019-50354 Reagan National Advertising of Austin v. Lamar Advantage Outdoor Company v. the City of Austin. And we will hear first from Mr. Horton. Did you argue in the Supreme Court? I wish I could say yes. I was in attendance. I have a quill, but I did not have the opportunity. You're always welcome here. It was a wonderful experience. Courtroom was closed, but I probably shouldn't spend all my time talking about that, but I will make reference to it, though, in my opening to the Court. May it please the Court, again, I've never had a chance to say that. Russ Horton here today, Your Honor, on behalf of Reagan National Advertising. I'll also be speaking on behalf of Lamar, the intervener in this case. As the Court knows, this case has come before you now on remand from the Supreme Court. The divided Court decided that this Court's determination of a facially content-based restriction was erroneous, but the Court nevertheless seemed concerned about the City of Austin's discriminatory treatment of a protected First Amendment speech. So the Court remanded to this Court with the request that this Court review essentially two issues. One, were the circumstances surrounding the adoption of this particular ordinance sufficient to question whether or not content neutrality is appropriate and whether or not strict scrutiny should still be applied? I'm not going to address that with the Court here today. The second issue is, should intermediate scrutiny, should this ordinance survive intermediate scrutiny? Austin's ordinance does not, and in fact, its selective digitization ban that allows unrestricted on-premise signage in digital form, but restricts that same signage in the off-premise context. Are we talking only about a small number of signs that have already been grandfathered through some other process? That is correct, Your Honor. How many are we talking about? I believe the total is about, including both Reagan and Lamar, is less than 90, 85, 84, as I recall, what's in the stipulation. And Your Honor's correct. Essentially, what my clients and the interveners saw from the City of Austin was the conversion, meaning literally the taking existing panels, these signs, some cases have a single panel on a single side. In some cases, they have a panel on two sides. Most cases, these conversions sought only to sign. The sign request was simply to allow the digital, change the technology, change the display so it could be used in digital form. And the City said no, saying no, we do not allow you to change the method or technology for off-premise signage. Let me ask you, I'm not sure the record is very robust. Do you have an answer to whether non-digitized, I'll use the word traditional, traditional billboards are considered economically viable for your business? Well, I don't know that I know the answer there off the top of my head. I think it is an economically viable business in terms of . . . Well, certainly your business, but I'm talking about if you're stuck with the traditional one advertiser sign. My understanding, and again, Your Honor, this is not from the record. I'm just going to use my own kind of basic understanding that signs, like all signs, that simply because of the traffic counts or their particular location may not be as economically viable as others. One thing that I think was a little confusing . . . Let me follow up on that just a bit. When you look at the more recent code, there's no statement of purpose in the initial code, or maybe not initial, but the first one relevant to us. But in the current code, there's a whereas and wherefore section at the beginning. Among the interests that are said to protect the aesthetic value, reducing visual clutter, potentially harmful, recognize the unique impact of off-premises advertising on public safety, visual aesthetics, restrict new off-premises signs, minimize the impact of existing ones. It does seem to me that inherent in all that is perhaps a governmental interest in phasing out off-premises advertising, which is the ultimate aesthetic, I guess, when you're looking at it from the city's point of view. It's not to have these at all, but they've not done that. Is that in this case, is that a justification that's been argued to phase out by making them less viable, and hence, is that a legitimate governmental interest and a reason to distinguish between on- and off-premises? I don't believe so, Your Honor, in this case. The city certainly did not make that point at the trial, but the purpose . . . In the Supreme Court, we have seen . . . I think the issue, essentially, they've accomplished that and have accomplished that by their overall ban of all new signage, and essentially, I think the thinking behind that is that, through attrition and development, the existing signs will ultimately be . . . Is that an illegitimate interest? Would that not meet intermediate scrutiny? I think, as we concede in our brief, the interests of aesthetics and safety stated are substantial governmental interests, and I don't have a problem with that. Aesthetics is being satisfied by this phase-out, if you will. Problem, of course, is phase-out then triggers taking issues and things of that nature, which I don't think was an issue before this Court at this time. If they actually prohibited the signs you have now, that would be a takings question. Sure. But if they . . . You haven't argued takings in this case, have you, by . . . No, Your Honor. . . . using . . . just arguing intermediate scrutiny doesn't support this. Sure. So, I'm not sure we have a takings question here. No, I was simply saying . . . . . . legitimate governmental interest on intermediate scrutiny. Sure. I understand, Your Honor. The issue, though, on whether or not they wish to phase out these signs over time, I don't think that's been stated, or that they were seeking through some detrimental economic impact to cause a phase-out over time. And again, in these particular situations, we're talking about signage that, in many cases, are in commercial zones. In fact, one thing that was not entirely clear, I think, from the record below, was that the way signs are developed or the way signs have grown throughout the City of Austin, essentially, is they're all within commercial districts, on-premise and off-premise generally. And if what the City is attempting to accomplish is its stated goals of aesthetics and safety, then I think they need to implement that in a uniform way. And it's this disparate treatment that was the issue that we raised in this particular case. Yes, Your Honor. Sometimes, when we get a case back, because this isn't, perhaps at least for me, the first case I've gotten back, we send it immediately to the district court. But in this case, the district court had decided the intermediate, but you said that there wasn't as robust of findings or things as you . . . I'm wondering, would there be any advantage in us passing this on through to the district court to decide something in the first instance, or is this case ready for us? I think the case is ready for this court, and I think that raises an issue that I know the City spends a fair amount of time, and I might as well just go ahead and address it now, and that's the issue is, is it properly before this court? Has there been a waiver issue or anything of that nature? And let me say, I think in this case, while this court has broad discretion to make a determination about, you know, any sort of procedural waiver, in this particular case, actually, the record, I think, was fully developed. If you look, in fact, at the briefing that we filed before this court, we concluded our briefing before this court with a general constitutional argument that the City's actions were unconstitutional. The City, in their brief before this court previously, also had an entire section discussing intermediate scrutiny. And the district court discussed it, and the Supreme Court told us to look at this. Exactly. And I should point out, because I was reminded as I prepared for our argument, that, in fact, if you look at the briefing, this is in footnote one of our brief to the court, our briefing to the Supreme Court and the briefing of the City raised a fully joined issue with intermediate scrutiny. But I should point out, because it wasn't clear, and I was reminded as I was preparing, on page 98 of the Supreme Court's transcript, counsel for the City raised at the very, it was in rebuttal, before anybody, after anybody could say anything, the issue of waiver, and claimed that, in fact, the The Supreme Court, being asked by the City to make a finding of waiver, did not elect, then, to reverse and render. In fact, what the Supreme Court did is decide to send it back to this court, not the district court, this court, with essentially two issues to decide. One, as I said, are there circumstances that would allow strict scrutiny to apply? And two, does it meet intermediate scrutiny? Notably, waiver was not one of the issues the court asked this court to decide. So I think the issue is squirrelly before this court. I don't think there's been a waiver, and I just wanted to address that, since that's But what would you say, to my perception, by the way, sending it back to here, as opposed to the district court, is just the way it's done. I don't know if I'd read too much into that. They don't skip us, even though they wouldn't mind being skipped sometimes, probably. But it does seem to me that this case is much more now an issue of discrimination, almost, between allowing digitization on-premises advertising, as opposed to off-premises advertising. I'm not sure that is the way it had been presented all along. Well, in fact, Your Honor— I mean, that was the issue they sent it back on. Sure. It's a distinction that the city makes. Well, respectfully, Your Honor, if you look at our initial brief to this court, the issue, as we stated in that, was the city's refusal to allow us to digitize, while at the same time allowing others—or, excuse me, not allowing us to digitize, while—I keep saying digitization, and it always trips me up, so I'm just going to use digitize—while not allowing us, that was our constitutional challenge to this case. And quite candidly, Your Honor, I think we probably adopted the digitization from this argument, because I liked the term. I thought it worked well in that ultimatum at the end of the brief. But that's always been the issue before this court. Our application to the city, so it's absolutely clear, was not to add one additional sign to the City of Austin skyline. We didn't ask to add any additional sign faces to the City of Austin skyline. All we were asking to do was to convert a handful, a limited number, of grandfathered signs, not all of our signs. And so it's clear, and I want to make sure it's clear, that is the record before this court. I don't think there's any dispute about that. Let me ask you about the City of Cincinnati case, discovery versus discovery. Would you equate what's going on here to the distinction Cincinnati made in the kinds of racks that were allowed to be present, some with newspapers, some with other kinds of advertisements? Yes, Your Honor, and we raised the City of Cincinnati case, which is not a direct hand-in-glove fit, understandable. But what we're talking about is essentially the same sorts of, at that time, I guess, technology that was available, newsstands, we don't see those anymore, but the technology available at the time of newsstands, which proliferated for newspapers, but the City of Cincinnati decided we don't want to use that for handbills, commercial speech. The reason I see Cincinnati as perhaps relevant in trying to figure out how it fits is they're talking about numbers, at least the city was talking about numbers. We got all this stuff we don't want, but we're not going to eliminate newspapers, and the only thing we're going to eliminate are the racks that hold other kinds of flyers in them. And this is a numbers issue, it seems to me, too, in your case, that the city wants to affect the numbers of these signs. But it does seem to me that the Supreme Court in the City of Cincinnati did recognize an interest in numbers, but they just didn't think it was justified. And that's one of the reasons I'm concerned. I don't know, I wouldn't read what Judge Elrod said as an endorsement of it, but let me say I'm at least open to the need to send this back to district court to get more into, if we really are going to focus on what the Supreme Court told us to focus on. I don't know the case has been presented that way, and I think some of the justifications, if that's going to be the focus, might be elaborated on. Well, respectfully, Your Honor, and I understand the court has... I know you want to win here, and I'm not trying to say that, but I'm asking, do you see any viability regardless, I can't ask you to say regardless of whether you think it helps your case or not. I understand, Your Honor. Now, in this particular case, the city didn't address the numbers. They addressed it as a total ban. We don't allow this under any circumstances. If it had been a single sign face, we would not have allowed it. And I think that was the city's position then, and I think that's going to be the city's position now. And I think to say, look, if you'd only asked for 20 or 30 or 40, it would have been fine. And the problem then, it seems to me, if they're going to do that, you know, if you read amici and you read some of the parade of horribles, if you will, that the city proclaims in its brief will result if the court were to fine for my client, the real complaint they should have is not with what my client is attempting to do, but with the counsel for making a determination that they were going to allow the proliferation of this type of technology in other contexts. Again, you don't get to say you're meeting these compelling governmental interests, these important governmental interests, aesthetics and safety, in this one instance, by barring this handful while at the same time turning a blind eye to a proliferation of on-premises signs. And the other point I should make is the City of Austin Code does not limit the number of on-premises signs. It prohibits all new off-premises signs, but it does not in any way eliminate the number of on-premises signs. Does Regan or Lamora have any or many on-premises signs advertising the activities on that property? Are your signs only the off-premises ones? Well, essentially, our clients are both in the business of out-of-home advertising, so essentially off-premises signs. Now, I'm going to ask— what the City allows digitization doesn't help either one of you, I suppose, if you don't have those signs. Well, now, when I say our clients don't have those kind of signs, there are actually a number of examples in the City of Austin where existing on-premises signs are displayed on the same structure as an off-premises sign at the same time. So you actually have in many—not many, but they have a number of cases in the City of Austin where you see both at the same time. I've gotten a little off my outline here, but I would like to reserve the rest of my time for rebuttal unless the Court has any other questions. Thank you. Thank you, Your Honor. Mr. Hicks? May it please the Court? I apologize. I have a bad cough, so I'm going backwards. First, I want to address the merits of the case first and then the waiver issues. The merits of the case, I'm not a lawyer, I'm not a lawyer of this case, but I don't want to seem like I'm defensive in avoiding the merits, which it sometimes can seem like if you argue the waiver first. But to address the merits of the case, we have to decide what the claim is that's being made here, that's been made here and was made in the Under either one of them, this is a challenge to a time, place, and manner restriction that the City of Austin has established. And that challenge is a First Amendment challenge, not a takings challenge, not an equal protection challenge. It's a First Amendment challenge to the pre-2017 Austin sign code. Does it matter if it's 1 or 20 or 86? Does it matter? I'm sorry? Does it matter if we're talking about 1 sign or 20 signs or 86 signs? No, it doesn't. I will mention— So a single one, you would make the same argument? I believe so. I'm not sure I'm grasping what I'm saying even right now, but I believe it would be the same argument. Let me just say this real quickly. There are more grandfathered, off-premises signs than are at issue in this case. Far more. These are just the applications for permits that are before you. I don't remember the number exactly. I've been told it's around 500 in Austin altogether, so it's not an off-premises, grandfathered sign. These are just the ones they sought permits to digitize. Okay, so the question is, what is it that the City is doing that they're challenging? In the trial court, here the first time, and all the way up until their first full-fledged brief in the Supreme Court, they were challenging the on- and off-premises distinction. That was their claim. It was not a digitization thing. They were challenging the on- and off-premises rule, and they said the remedy, if they win on that First Amendment challenge, the remedy is that they should be able to digitize their off-premises signs, but they were not challenging a digitization thing. In fact, there is no digitization thing, broadly speaking. So anyway, so now— You can have digitization of on-premises. Isn't that right? But you cannot have digitization of these grandfathered off-premises signs. No, that's not true. That's not true. Okay, can you— They have— Can you explain to me what they— They have six of their signs that they sought permits on were already digitized. They weren't digitized the way they want them to be digitized. They want the fancier, modern version of digitization, but they were digitized. They were electronically controlled, changeable copy signs. It's in the stipulations. They've even said that electronically controlled, changeable copy is a— Okay, so put the six to one side. All the rest of them, though, are not digitized. Is that correct? And that's what they're hoping to do, modern digitization? There's no evidence they are, and I don't believe they are. And we're saying they can't do it, but it's— Okay, they can't do modern digitization on these signs, even though you allow on-premises people to do modern digitization. Right, and that's perfectly appropriate. For one thing, it's right in the heartland of what non-conforming uses, how they're treated in land-use activities by cities. The idea behind them is you get to continue what you were doing. This was in 1983 that we passed this. You get to continue having a sign or a house that's the wrong kind of house or whatever it is. You get to have that, but you don't get to increase the degree of non-conformity during that period because the whole idea behind it is eventually they peter out and they will go away. These signs have not gone away. They just don't get to digitize them because it would increase the degree of non-conformity. Now, their challenge below, here, and as the Supreme Court accepted the case, was not to that. It was to the on-off-premises distinction. They never made a First Amendment challenge to a rule that says you can't digitize the way you want to digitize. Well, it's still an on-off-premises distinction. There was an on-off-premises distinction, but that distinction was what they said was unconstitutional. Right, and there's still an on-off-premises distinction now because we just told me that you can do a modern on-premises, but you can't do a modern off-premises. The grandfathered ones, that's still an on-off-premises. It's not the same way because it's only as to grandfathered signs that weren't already digitized. You can't increase the degree of digitization. Let me move beyond that, if I may. This is the first time that's happened, and we told, that's been leveled in a court, other than the effort to do it at the Supreme Court, which didn't bite. You will not see this anywhere in the Supreme Court decision. It didn't bite on their effort to get this done. Your Honors, Judge Elrod said earlier, well, the Supreme Court sent it back to us for, to look at intermediate scrutiny. It did not do that. That's one of the things you can look at, but you can look at the last paragraph. It said nothing about skip past the waiver issue and only look at intermediate scrutiny. But you're saying I misspoke? Is that what you're trying to say, Mr. Hicks? I'm just saying, I don't know if you misspoke. I just disagree if that is the reading that is given to that. I disagree. Would you like to read, take your time to read the mandate to us, please? Yes. I mean, I don't know if you want me to read it out loud. Yes, sir. Okay. This court's determination that the city's ordinance is facially content-neutral does not end the First Amendment inquiry if there is evidence that an impermissible purpose or justification under, this is long, underpins a facially content-neutral restriction, for instance, that restriction may be content-based. I'll skip the cites. Moreover, to survive intermediate scrutiny, a restriction on speech or expression must be narrowly tailored to serve a legitimate, a significant government interest. The parties dispute whether the city can satisfy these requirements. This court, however, is a court of final view, not first view, and it does not ordinarily decide, in the first instance, issues not decided below. In particular, when we reverse on a threshold question, we typically remand for resolution of any claims, any claims. The lower court's error prevented them from addressing. Because this court did not address them, the court leaves them for remand and expresses no view. Let me call your court, the court's attention to the approach taken by this court in text, in the Hohelman's Health. In January of 2022, the Hohelman's Health case was on remand from the Supreme Court, and in that decision, 23 February 389, I think, 380 maybe, 380, on January 22nd, at pages 384 through 385, the issue was, what is it that came back to us? And the court says very clearly, we do not infer that issues are cut out away from us to address if it isn't explicit in the Supreme Court's ruling. And so the waiver issue is still here. We told the Supreme Court, in rebuttal at the oral argument, we told the Supreme Court there was a waiver problem for them on the intermediate scrutiny issue, and it's for this court to decide. And that is what has come back to this court. It is not only, the court did not say disregard waiver issues. It said nothing about disregarding intermediate scrutiny. Counsel, regardless of that, you may well be right. It seems to me we have a legal issue before us. It seems to me we have a legal issue before us. If either one of you didn't hear it from your friend on the other side, if either one of you says more facts are needed in light of the Supreme Court's vacating of our decision and sending it back, then that's a different question. But to the extent this is a legal issue, our case law says we have the discretion to decide it. Why shouldn't we? Because the approach to it would mean that we, the city, have been deprived of an opportunity to put on evidence with respect to this claim. Well, that would be a reason to send it back to the district court. That would be a reason to send it back to the district court, not to end it here, but to get a fair resolution to the extent this case has changed a bit since it went to the reality to deal with a very important matter for the city and for Reagan and Lamar. I think that would be appropriate if the court is going to let the reformulated recast issue be considered here. Now, in terms of the exercise of discretion about whether to hear something that's been waived, this was so explicit that they waived it. It wasn't subtle. It wasn't inadvertent. It wasn't accidental. They specifically said to this court, we are not going to brief that issue. We are not going to brief intermediate scrutiny. They said it at page 36, footnote 7. Because they thought it was a slam dunk, strict scrutiny in the Court of Appeals, and we were wrong, but we agreed with them, and three justices of the Supreme Court were also wrong and think it's strict scrutiny. So now that we know it's not strict scrutiny, the Supreme Court said it was remanded to us to look at intermediate scrutiny. Among other things. Yes, and so we have to look at intermediate scrutiny. I think you have to first look at whether there's waiver. Well, they didn't actually ask us to do that, but we can do that. Okay, and then you can look at intermediate scrutiny on an off-premises distinction with respect to strict scrutiny, I mean to intermediate scrutiny. That case was teed up at the trial court all the way through. That issue was teed up at the trial court all the way through, and this court can decide on the record it has before it that the city satisfies intermediate scrutiny with regard to its on and off-premises distinction. It's only if the court gets to characterizing this as their new claim, as a digitization ban violating the First Amendment, and calling it a digitization ban when it isn't, then it may be appropriate to send it back, but it's only if the court exercises its discretion to reach something they expressly waived. This would never happen in a normal situation where the court says we don't care that you expressly waived it, we're going to reach it anyway. I don't think I'm able to hear you. You want it to end without getting, you want waiver to apply? Well, we'll think about it. We'll consider it. Let me ask you about, as I did before, what case law do you, what case do you think is most applicable here to support this on-premises, off-premises distinction you're making where one cannot be modernized and on-premises can? Well, I give two cases, Your Honor. Give me the law you think is most helpful. One case on the on and off-premises distinction is a summary dismissal. It's the Suffolk outdoor advertising case, 1979, cited in the U.S. Supreme Court decision in this case and also in Metro Media, where the court dismissed for want of a substantial federal question a claim that the on-off-premises distinction that city there or county or city had put in place did not present a substantial federal question because it was a reasonable time, place, and manner restriction. That controls here. It's been mentioned two times by the Supreme Court now. It isn't just a summary dismissal that this doesn't raise any big issue. That's warranted. The other strongest case, I would say, is Metro Media. It says you can make distinctions between on and off-premises. That one was commercial. That was with respect to commercial, but part four of the Metro Media decision is a majority opinion of the court. That part is, and it upheld exactly this kind of distinction, the on and off-premises distinction, and it even said it isn't necessary. We don't even have to have specific evidence on this distinction, and you can't just say, you let on-premises sign people have certain kinds of activities that you don't allow for off-premises signs. That's okay. That distinction is okay under the standard for time, place, and manner restrictions. Those are the two cases I would say are clearest. I don't know if I'm answering Your Honor's question, but that seems fairly clear to me. The waiver issue, I keep coming back to that. The city has been put in a position that it did not need to be put into. The court has been put into a position it did not need to be put into. This court could have addressed both claims, the intermediate scrutiny claim and the strict scrutiny claim, if the billboard companies had bothered to present it, and if the court had decided both of those the first time through, this case would probably be over because alternative holdings, as this court has said, Texas v. U.S. Footnote 158 back in 2015 is an example of it, this court has said alternative holdings are indecisive. Mr. Hicks, how do you distinguish the Discovery Network case? Is that the Cincinnati case? Yes, sir. City of Cincinnati v. Discovery Network. First, that's a commercial speech case, and this court said in its opinion here that the commercial speech cases do not apply. It rejected that analysis that Judge Pittman had gone through and said he used the wrong intermediate scrutiny test, so that's one difference. The other difference is those, the two . . . That was like, that commercial speech thing is a lesser standard, so the idea . . . No, it's a greater standard than the time, place, it's a tougher standard than the time, place . . . Right, it's tough, but what I'm saying is, it's a tougher standard. I'm saying it right. The time, place and manner restriction is an easier standard for the city to meet than the commercial speech standard, okay? So Judge Pittman is kind of a no harm, no foul because if he shouldn't have used commercial speech analysis for intermediate scrutiny, instead time, place and manner, then he's already inside the bubble, so to speak, and so it was acceptable, an appropriate decision by him. But, so the main . . . Can you still deal with it? Say it again, Your Honor. What if that was wrong, too? So can you deal with that? What if his ruling . . . Can you deal with the Discovery, ask straight up, please? So the other thing is, the kind of dispensers, I guess, that they had for the different kinds of pamphlets and leaflets and so on that were at issue in that case, were all occupying the same kinds of spaces. They weren't different in terms of on-premises, off-premises, which is a huge distinction, as Metro Media makes clear. They were all in the same place. They were in the same territory. They were on the same turf. They would be at the same corner of the same bus stop. Here, that won't happen because one is on-premises and one is off-premises and so they're different that way, too. So you wouldn't have the same kind of analysis. But the . . . I have a question about Metro Media, too, because it's concerned about the proliferation of off-premises. You said it could proliferate. Yes. This case cannot proliferate. We got a total number of signs. So that was a big part of Metro Media was the fear of the proliferation. And here, there's not the possibility of proliferation. Right, but the issue is with respect to inside the acceptable, the grandfathered, universe of grandfathered signs, you would have a proliferation of digitized signs. Right, but off-premises signs are not going to proliferate exponentially like the fear in Metro Media because it's just going to be digitizing ones that you already have and you already have all the other ones that are on-premises can be digitized. Those are quite different situations. Metro Media says on-premises, it's very different. They're restricted. In the Supreme Court, I believe, I'm not sure, maybe we just briefed it and they didn't talk about it here, but the court has talked about these things and said it's very different for an on-premises and off-premises sign with respect to even things here it would be digitization because there is a limit. On-premises signs here in Austin have limits on how big they can be and on matters like that. On the proliferation issue with respect to the grandfathered off-premises signs, there would be a proliferation of digitized signs, flashing signs in the middle of Austin distracting drivers and they're designed to distract drivers. That's the purpose of them and this is designed to add to the distraction proliferates in that sense because it's multiplied a hundred or a thousand fold because you cycle through these ads non-stop and they're flashing. These others, they have plenty of opportunity to have ads on their billboards now and have other avenues of getting out information about their business if that's one or their fundraising activities if it's a non-profit and so on. We are not interfering with that and what we have done is fully consistent with governing law. It's fully consistent. Digitization has not been addressed, digitization issues with respect to grandfathered signs in a non-conforming use status has not been addressed fully in evidence because it wasn't presented. Judge Pitlin said the sole issue at page 477 of his opinion or something 77. I can't remember the first number. He said the sole issue here is the on-off-premises distinction which is not this case. It's never come up until they briefed it in the Supreme Court and the Supreme Court never bit on their request that it happen. What were you saying about non-profits? They have non-commercial ads for instance on billboards and non-profits they don't have to have digitization to get their word out. Part of the test under Ward is whether there are ample other means of getting the word out and so non-profits not only can have their advertisements on billboards but they can leaflet, they can have many other ways of getting out their effort. Let's say it's health and safety for kids swimming in the summer or something like that's one of the ads they have. So does that have anything to do with this case though? Because we did talk at the last go-around about all these other scenarios and non-commercial scenarios but I'm trying to figure out if those are even pertinent. I was just mentioning that commercial and non-commercial interests have ample other means of getting the word out other than through digitization. That's part of the Ward test. But do we take this new statute though to only be talking about commercial? The new ordinance, the new ordinance it has other commercial it says or other commercial purposes at the end. I'm not following. The new statute is trying to loosen up and let commercial ads be substituted, non-commercial advertisements be substituted for commercial ads in case there was any question about that. It's never, there's no fact that it ever came up but it was on the it's kind of like Jesse Owens at the 1936 Olympics. Step back a step and make sure we do it right. So that 2017 amendment was merely a way to say let's just make sure non-commercial advertising has an equal shot at getting disseminated through the billboard process as commercial. That's all. That's all that was. It wasn't enhancing ability for commercial advertising to lock get locked in. Okay, thank you. Thank you. Briefly, Your Honor. There was a statement made by counsel and I want to make sure it's clear because I think what he's referring to he made a statement that that I was to my mind a bit confusing that a number of the signs were digital already. I think what he's referring to is there are a number of the signs. I think it was three. They're what are called tri-visions. You've probably seen them. The panels are like triangular and they flip and so that's what I think he's referring to is digitization. It's not the digital panels that the city allows in the on-premise context. So I think it was a little little confusing as it was presented but again you know as we raised before, Your Honor, I believe the court correctly analyzed this the first time. The city now wants to come in and say look it's a reasonable time, place, and manner restriction. We don't think you're really challenging digitization. But we didn't analyze it correctly the first time. I agree, Your Honor. I'm sorry. And again I'm reminded of the last time I actually was in this courtroom I was arguing another signed case involving fairly it was not the city of Austin but it was another sign code and I remember one of the judges asked me who wrote this Kafka because that would seem like a you know these sign codes are in some ways very confusing and many times a little internally inconsistent. But the issue that we took to the trial court and the judgment which we appealed to this court was a judgment that said no you cannot convert your existing grandfathered signs to digital. That was the issue. That was always the issue and that was the only issue. And so any attempt to say that we somehow recharacterized it or changed it or whatever again the issue that we're now before this court and I think the court has actually done the work of the intermediate scrutiny analysis. The opinion of this court makes it clear that the city did not present evidence didn't try to show that the handful of converted digitized signs would be a greater eyesore than the proliferation of on-premise signs around the city of Austin according to record from this court's opinion. At the same time this court pointed out that the city also presented no argument that this incremental increase of digital signs in the on-premise context would in any way adversely impact safety around the city of Austin. And again I don't want to there's an argument every time I've been involved in these kind of cases there's always this argument about if we do this they'll be everywhere. We'll be Vegas or we'll be Times Square. That's not the case. That's not what we asked to do. We've not asked this court to strike down the city sign code broadly and to allow anyone to digitize anything. No we've come in asked for permit conversions on a limited number of signs under a code that's now been supplanted and we think it was appropriate to do so in the manner in which we did. In this particular case your honor we have brought this to you. We've now come back for our second time. I think that the record is complete. I think this court has all the evidence that is necessary. As counsel has conceded the city's position the city's position is more than one. The problem is to say it's a reasonable time, place and manner to impose it upon this. Well the problem is they come back to the same question as well. We are saying that the time, the place and the manner in which you erect this kind of digital panel that's the rule we're going to apply to you but we're not going to apply it to you over here. And it's that disparate treatment that clearly this court looked at and was concerned and the conclusion of this opinion prior opinion quoted I think it was Justice Scalia from the Florida fight case. You cannot essentially say you are protecting a particular governmental interest when you turn your back and allow others to expose it or do it harm in another context and that's exactly what the city has done in this particular case. They've not properly justified it and we believe that based on an intermediate scrutiny review the city's code must fail. For that reason we ask this court to reverse the trial court. Thank you very much. Thank you. We appreciate both arguments today. The case is submitted.